UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-CR-0180-CVE |
| | ) | |
| RICO STARKS, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Defendant Rico Starks is charged by indictment as a felon in possession of a firearm and ammunition.  Dkt. # 4.   Defendant moved to suppress all evidence seized during a search of a residence located at 2603 East 41st Street North, Tulsa, Oklahoma (Dkt. # 16), to which the government responded (Dkt. # 22).  An evidentiary hearing on the motion was held on January 11, 2013.

## I.

On November 12, 2011, the Tulsa Police Department (TPD) received an anonymous tip from Crime Stoppers that defendant, who had at least one outstanding arrest warrant, was located at 2603 East 41st Street North, Tulsa, Oklahoma.  TPD officers verified that defendant had active felony arrest warrants, including a warrant for robbery with a firearm.  Prior to proceeding to the residence, officers first met a few blocks away around the 3900 block of North Columbia Avenue.  Sergeant Mark Wollmershauser was responsible for formulating a plan to approach the residence, and Wollmershauser delegated some officers to rear containment on each side of the fence behind the residence, as well as assigning several officers to join him at the front door.  Additionally, officers reviewed a map of the property and a photograph of defendant.  Thereafter, officers, all of whom

were wearing TPD uniforms, proceeded to the address identified by the anonymous tip, and knocked on the front door.  The residence belongs to Dyer, who is defendant's girlfriend's mother.  There are three accounts as to what happened when officers knocked on the front door.  Wollmershauser stated that he knocked on the door, and that teenage girls answered the door, along with a middle aged black woman.  Wollmershauser could not remember whether the teenage girls or the woman came to the door first.  Wollmershauser testified that he told the woman that he had received information that defendant was at the residence and that officers had a felony warrant for defendant's arrest. Wollmershauser asked her if defendant was at the residence, and the woman stated that he was "just right around here."  Wollmershauser further testified that the woman was looking around herself as she said it, as if she had just seen him moments before, and Wollmershauser asked the woman if she would mind if officers looked for defendant, to which the woman stated that the officers could, and she proceeded to follow the officers through the residence.

Officer Brandon Smith was at the front door with Wollmershauser.  Smith testified that he was absolutely certain that a black, middle-aged woman answered the door alone, and she stated, when questioned by Wollmershauser, that defendant had been there, but that he had left about an hour prior to officers' arrival.  He did not remember the exact words the woman used, but Smith stated that he was certain that the woman told officers that they could search the residence.  Smith testified that the officers thereafter entered the house and did not find defendant, but that the officers looked around the first and second floor.  Smith testified that, while he and Wollmershauser were on the second floor, they heard a radio call that defendant and other males were in the backyard.

Dyer testified that, at the time police came to the residence, a birthday party was being held for her great niece, who was turning seven.  Dyer stated that she did not answer the door, but that

2

her niece, who was 21 years old at the time, answered the door and told her that officers were at the door. Dyer testified that her niece is not a "middle aged" woman, and that she was the oldest woman present. Dyer stated that officers told her that they had a fugitive warrant for defendant. Dyer told officers that defendant was not at the residence, but that defendant had been there approximately one hour earlier. The officers asked Dyer if they could step in and talk with her. Dyer stated that she consented to that request, and three officers stepped into the foyer area. Dyer testified that the officer who requested that officers be allowed in the residence stayed with her but the other two officers proceeded into a TV room. Dyer stated that she never gave permission to search her residence but, instead, that she asked the officer in the foyer not to "scare" the kids and that the officer basically said that he had permission to search pursuant to a fugitive warrant. Dyer further stated that she would not have allowed the officers to search because there were too many children present for the birthday party, and that she did not even know that officers were in the backyard. While Dyer was talking with the officer in the foyer, she heard the radio call that defendant and two males had been found in the backyard.

Officer Adam Dawson also responded when officers were informed of the anonymous tip, and he was assigned the duty of rear containment, so he proceeded to a neighboring property line where he could see into the backyard of the residence. Dawson stated that the backyard was full of trailers, vehicles, and other debris. When Dawson received a radio call that consent had been given to look around for defendant, he went over the fence, and he looked into a window of a recreational vehicle (RV) that was parked in the backyard. The RV did not look operational, and it looked as if it had been sitting in one spot for several years. Dawson saw a holster on a mattress in the RV, and he thought he heard something moving within the RV. Dawson walked to the door of the RV,

opened it, and found three black males, one of whom he identified as defendant.  Dawson drew his pistol and waited for other officers. While waiting, Dawson smelled a strong odor of marijuana coming from the RV, and he saw ammunition and packaging, similar to that used for narcotics, on the bench seat near defendant's feet.  Dawson also saw plastic wrapping, consistent with that used for marijuana packaging, on the table in the center of the RV, in the middle of the three males.

As other officers removed defendant and the two other men from the RV, Dawson saw several shotgun shells in the RV.  Dawson performed a protective sweep of the RV, and he noticed a small amount of marijuana on the bench seat, where defendant's feet had been, next to the ammunition.  Dawson identified the ammunition on the bench seat as nine rounds of .22 caliber ammunition.  One of the "chunks" of marijuana had fallen to the back of the bench seat cushion. When Dawson moved to the cushion to check for more "chunks," he found a .22 caliber revolver under the cushion.

Dawson searched defendant incident to defendant's arrest, and he found four .22 caliber cartridges in defendant's pocket.  Two of the cartridges were the same as the ammunition found on the bench seat cushion, and two were "blanks," but were also .22 caliber.  Dawson advised defendant of his <u>Miranda</u> rights while he transported defendant in his patrol car, and defendant admitted knowing that he had an outstanding felony arrest warrant.  Defendant also admitted that he had been in Texas, and that he stayed at several different locations to avoid capture.  Defendant stated that he could not explain why the ammunition that was found in his pocket matched the caliber of the gun as well as the ammunition found close to the gun.

4

## II.

In order to raise a Fourth Amendment claim, a person must have standing.  To demonstrate standing, "in the context of a search, the defendant must show that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable."  United States v. Higgins, 282 F.3d 1261, 1270 (10th Cir. 2002). "[A] social guest has a sufficient expectation of privacy to challenge unreasonable searches of his hosts's home."  United States v. Rhiger, 315 F.3d 1283, 1286-87 (10th Cir. 2003).

Dyer stated that her daughter, Tonnyell Bell, was dating defendant at the time of the search. Dyer was not sure how long defendant and Tonnyell Bell had been dating, but Dyer stated that she met defendant in March 2011, prior to the search of the residence.  Further, Dyer testified that defendant was invited into her home, and that her son Darius Bell and defendant were acquaintances. Dyer further stated that defendant, Darius Bell, and her nephew Stanley Rice, were going in and out of the back of the residence that day.  Dyer, the homeowner, classified defendant as a social guest in her home and testified that defendant was invited into her home.  Thus, defendant had standing to raise a Fourth Amendment claim.

"[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 585-86 (quotation omitted); see also United States v. Jones, No. 11-3104, 2012 WL 6582319, *14 (10th Cir. Dec. 18, 2012).  "A warrantless search of a home is presumptively unreasonable, and evidence obtained from such a search is inadmissible, subject only to a few carefully established exceptions."  United States v. Harrison, 639 F.3d 1273, 1278 (10th Cir. 2011).  One exception to the warrant requirement is voluntary consent. United States v. Jones, No. 11-3104, 2012 WL 6582319, *14 (10th Cir. Dec. 18,

2012).  "'Voluntary consent' consists of two parts: (1) the law enforcement officers must receive either express or implied consent, and (2) that consent must be freely and voluntarily given."  Id. (citations omitted).  "In determining the voluntariness of consent, the Fourth Amendment requires that 'a consent not be coerced, by explicit or implicit means, by implied threat or covert force.'" Id. (citing Schneckloth v. Bustamonte, 412 U.S. 218, 228 (1973)).  The government bears the burden to establish by a preponderance of the evidence that consent was given freely and voluntarily.  See United States v. Burciaga, 687 F.3d 1229, 1230 (10th Cir. 2012) (finding the government bore the burden to establish "that reasonable suspicion supported the officer's stop of Defendant's vehicle." (citation omitted)); United States v. Romero, 247 Fed. Appx. 955, 960 (10th Cir. 2007) (unpublished)[1] (finding burden was by preponderance of the evidence in case involving voluntary consent to search residence); United States v. Lopez-Guzman, 145 Fed. Appx. 627, 628-29 (10th Cir. 2005) (unpublished) (same).  Whether consent was voluntary is a question of fact "to be determined from the totality of all the circumstances."  See also Harrison, 639 F.3d at 1278; Jones 2012 WL 6582319 at *14.  The Tenth Circuit has found that a "two-part test" should guide this inquiry: "[t]he government must (1) 'proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given,' and (2) the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010) (quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Defendant argues that officers never received consent to search the residence and, therefore, that any resulting search and seizure was a violation of the Fourth Amendment.  The government

---

[1]     This and other unpublished decisions are not precedential, but are cited for their persuasive value.  See Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

6

argues that officers received express consent.  It is the government's burden to show that express

or implied consent was voluntarily given.  In this case, the government proffered two officers as

witnesses to the consent allegedly given by the homeowner; however, there were discrepancies in

the officers' testimonies that are material to the determination of consent.  First, Smith, consistent

with Dyer's testimony, testified that Dyer told officers that defendant left the residence one hour

prior to officers' arrival.  Wollmershauser, however, stated that the woman  made comments and

movements that suggested that she thought defendant had been there very recently.  Second, Smith

and Wollmershauser's testimonies differed regarding who answered the door.  Smith was certain

that a middle-aged black woman answered the door alone, while Wollmershauser testified that

teenage girls were present and that the teenage girls possibly arrived at the front door before the

middle-aged woman.  Third, Wollmershauser and Smith were unclear as to the language Dyer

allegedly used when she consented to allow them into her residence.  Wollmershauser testified that

he asked whether officers could enter and look for defendant, and he stated that he informed Dyer

that she could accompany them while they walked through the residence.  However, Smith testified

that Dyer simply consented to a search of the residence.  While discrepancies in the testimony of the

officers could be the result of the passage of time (here, more than one year), where the government

bears the burden of proof, and the discrepancies are material to the issue of consent, the Court should

not turn a blind eye to even minor discrepancies.[2]

---

[2]     The Court does not find that any officer was not credible or that an officer intentionally
falsified testimony or otherwise was intentionally deceptive.  Instead, the discrepancies in
the officers' testimonies, when balanced with other credibility findings, are especially
important where, as here, the government bears the burden.

Further, the Court finds that Dyer was credible.  Dyer's testimony was consistent with the testimony of Smith as to the presence of defendant an hour earlier, and the Court finds that she appeared to have a clear recollection of the events in question.  Because the Court finds that Dyer was credible and because of discrepancies between Smith and Wollmershauser's testimony that are material to the issue of consent, the Court finds that the government has not met its burden to show that express consent was voluntarily given to search the residence.  It is undisputed that TPD officers never obtained a search warrant for the residence. Because a warrantless search of a home is presumptively unreasonable, defendant's motion to suppress should be granted.

**IT IS THEREFORE ORDERED** that defendant's motion to suppress (Dkt. # 16) is **granted.**

**DATED** this 14th day of January, 2013.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE